#24011-a-RWS

**2007 SD 21**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                               Plaintiff and Appellee,

v.

LANCE G. OWEN,                               Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
ROBERTS COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JON S. FLEMMER
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General
Pierre, South Dakota                               Attorneys for plaintiff
                                                   and appellee.


PETER R. JONES
DEBRA FLUTE
GREGORY J. GARVEY
Sisseton Wahpeton Oyate
Public Defender
Agency Village, South Dakota                       Attorneys for defendant
                                                   and appellant.

\* \* \* \*

ARGUED JANUARY 8, 2007

OPINION FILED **02/28/07**

#24011

SABERS, Justice

[¶1.]     Lance G. Owen (Owen) was convicted by a jury of aggravated assault and first degree murder arising out of the stabbing death of Adrian Keeble (Keeble). He raises several issues on appeal.  We affirm.

**FACTS**

[¶2.]     About 2:30 a.m. on January 19, 2005, Owen and his girlfriend, Dawn DeMarrias (DeMarrias), joined a group of people at Heather DeCouteau's (DeCouteau) home in Peever, SD.  In the group were DeCouteau, Vanessa LaFromboise (LaFromboise), Ray Shepherd (Shepherd), Curt Snow (Snow) and the victim, Keeble.  DeCouteau and LaFromboise had been drinking alcohol and smoking marijuana for the last several hours.  Snow and Keeble had arrived a few minutes prior to Owen and had brought more alcohol and beer.  Owen had brought some marijuana.

[¶3.]     The group proceeded to drink and smoke Owen's marijuana.  As the night progressed, Owen asked DeCouteau if she knew anyone who would trade him methamphetamines for his marijuana.  Owen also talked about selling the rest of his marijuana.

[¶4.]     At some point that night, Keeble allegedly stole some of Owen's marijuana.  According to Snow, Owen was looking directly at Keeble when he stole it.  According to Shepherd, Owen did not see who took it, but noticed it was gone. Owen became angered and repeatedly asked who took his "weed."

[¶5.]     Shepherd saw Owen "grab the side of Keeble's head and make 'a lot' of jabbing motions," which struck Keeble.  DeCouteau saw that Owen had the fillet

-1-

knife from her sink and saw him stab Keeble several times in the neck. Snow did not see Owen stab Keeble but saw the knife in Owen's hand after Keeble fell to the floor. Snow went after Owen and ended up with a serious cut on his hand. Owen managed to escape after his girlfriend, DeMarrias, threw herself on Snow and then fled with Owen. The remaining members of the group called 911 and attempted to perform CPR on Keeble. He was pronounced dead at the Indian Health Service Hospital in Sisseton.

[¶6.] A warrant was issued for Owen's arrest. He was found and arrested in Montevideo, Minnesota on January 20, 2005, late in the evening. Department of Criminal Investigation (DCI) agent, Craig Price (Price), drove to Minnesota and began interviewing Owen at 8 a.m., January 21. During this interview, Owen admitted he stabbed Keeble repeatedly in the throat, head and face. He was brought before a magistrate for an extradition hearing at 1:30 p.m. that afternoon.

[¶7.] Owen was indicted with first degree murder for the death of Keeble and aggravated assault charges for the cut to Snow's hand. Prior to the trial, Owen moved to suppress his statements to Price. After a suppression hearing, the trial court denied the motion. Owen also made a motion to dismiss the indictment alleging Peever housing was a dependant Indian community and the State had no jurisdiction over his crime. The court denied this motion finding Peever was under the jurisdiction of the State of South Dakota.

[¶8.] After a jury trial, Owen was found guilty of both first degree murder and aggravated assault. He received a life sentence for Keeble's murder and fifteen

years for the aggravated assault, to run concurrently. He appeals and raises the following issues:

1. Whether the trial court abused its discretion in admitting other acts evidence.

2. Whether the trial court erred in denying the suppression of Owen's statements to law enforcement.

3. Whether the trial court erred by denying Owen's requested self-defense instruction.

4. Whether there was sufficient evidence to prove first degree murder.

5. Whether the State had jurisdiction over Owen's crimes.

6. Whether there was a *Batson* violation in the State's exercise of its peremptory challenges.

## STANDARD OF REVIEW

[¶9.] Evidentiary decisions of a trial court are presumed correct. State v. Boston, 2003 SD 71, ¶14, 665 NW2d 100, 105. We review evidentiary decisions and the denial of a proposed jury instruction for an abuse of discretion. *Id.* (citing State v. Goodroad, 1997 SD 46, ¶9, 563 NW2d 126, 129). We determine "whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.*

[¶10.] Questions of jurisdiction are legal questions reviewed under a de novo standard. Grajczyk v. Tasca, 2006 SD 55, ¶8, 717 NW2d 624, 627. Likewise, whether statements made to police were voluntary is a legal question and is reviewed de novo. State v. Holman, 2006 SD 82, ¶13, 721 NW2d 452, 456 (quoting State v. Tuttle, 2002 SD 94, ¶20, 650 NW2d 20, 30).

[¶11.] A challenge to the State's use of peremptory challenges is reviewed for clear error, for the finding of intentional discrimination is a factual determination. State v. Martin, 2004 SD 82, ¶¶13, 16, 683 NW2d 399, 403, 405.

[¶12.] **1. Whether the trial court abused its discretion in admitting other acts evidence.**

[¶13.] Prior to trial, the trial court ruled that it would not allow testimony regarding some of Owen's prior bad acts, but the State could use testimony regarding Owen's statements and actions that happened that night. During trial, the State was allowed to present testimony that Owen brought marijuana and shared it with the group and discussed selling or trading marijuana for methamphetamines. Owen alleges the trial court abused its discretion in admitting this testimony because the prejudicial effect substantially outweighed the probative value. He also argues the trial court did not conduct the required balancing test on the record.

[¶14.] The defendant's other acts may be admissible under SDCL 19-12-5 (Rule 404(b)). The trial court must employ a two-step process when determining if prior bad acts should be admissible. First, the offered evidence must be relevant to a material issue in the case. State v. Jones, 2002 SD 153, ¶10, 654 NW2d 817, 819. Second, the trial court must determine "[w]hether the probative value of the evidence is substantially outweighed by its prejudicial effect." *Id.*; SDCL 19-12-3 (Rule 403). This balancing must be conducted on the record. State v. Andrews, 2001 SD 31, ¶9, 623 NW2d 78, 81.

[¶15.] The trial court did not conduct an on the record balancing of the offered evidence's probative value against its prejudicial effect. However, this

evidence can still be admitted, not as "other acts" evidence, but as res gestae evidence. *Andrews*, 2001 SD 31, ¶9, 623 NW2d at 81; *Goodroad*, 1997 SD 46, ¶10, 563 NW2d at 130. Other bad acts evidence is admissible "where such evidence is 'so blended or connected' with the one on trial . . . that proof of one incident involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged." *Andrews*, 2001 SD 31, ¶9, 623 NW2d at 81 (quoting *Goodroad*, 1997 SD 46, ¶10, 563 NW2d at 130). Moreover, "evidence of uncharged criminal activity is not considered other crimes evidence if it arose out of the same transaction or series of transactions as the charged offense." *Id.* Here, Owen's statements regarding the potential sale or trade of marijuana for money or methamphetamines is not "other acts" evidence, but res gestae evidence as it "arose out of the same transaction or series of transactions as the charged offense." *See id.*

[¶16.]     In *Goodroad*, the trial court admitted criminal activities that occurred during the month leading up to the charged crime as res gestae evidence. 1997 SD 46, ¶11, 563 NW2d at 130. Here, the testimony regarding marijuana use, potential sale and/or trade for other drugs and the "theft" of marijuana occurred in a short amount of time before Keeble's murder. The potential sale of marijuana and its subsequent theft provides a potential motive for Owen's actions. The use of the marijuana and its theft "explains the circumstances" around Keeble's murder and is properly admitted res gestae evidence.

[¶17.]     At oral argument, the question arose whether the evidence should be admitted when no FRE 403 (SDCL 19-12-5) balancing was conducted on the record. There are two reasons why the evidence is still admissible, despite the absence of an

on-record 403 balancing. First, our line of precedent that requires a balancing test to be conducted on the record refers to "other acts" evidence. *Andrews*, 2001 SD 31, ¶9, 623 NW2d at 81; State v. Steele, 510 NW2d 661, 667 (SD 1994) (citing State v. Klein, 444 NW2d 16, 18 (SD 1989)). Res gestae evidence, unlike other acts evidence, does not require a 403 balancing to be conducted on the record in order for it to be admissible. *Andrews*, 2001 SD 31, ¶9, 623 NW2d at 81; *Goodroad*, 1997 SD 46, ¶10, 563 NW2d at 130; *see also* State v. Pasek, 2004 SD 132, ¶20, 691 NW2d 301, 308-09 (admitting res gestae evidence with no balancing mentioned on the record). Second, the balancing test of 403 does apply to the evidence,[1] but there is nothing in our past precedent that requires the 403 balancing test to be conducted on the record.[2] *See Andrews*, 2001 SD 31, ¶9, 623 NW2d at 81 (affirming the admissibility of res gestae evidence despite the lack of an on record balancing test).

[¶18.] Owen also argues that Price's testimony that Owen "absconded" after the murder was so prejudicial that the court erred when it denied his motion for a mistrial. Price testified that during the course of his murder investigation he heard

---

1. "The balancing test of SDCL 19-12-3 (Rule 403) applies regardless, and the statement is subject to the requirement of the other rules of evidence." State v. Engesser, 2003 SD 47, ¶42, 661 NW2d 739, 753 (quoting John W. Larson, South Dakota Evidence § 804.6, p 703 (1991)). *See also* State v. Luna, 378 NW2d 229, 232 (SD 1985) (finding the rules of evidence are "the criteria for admissibility of evidence") (citing SDCL 19-9-1).

2. FRE 403 (SDCL 19-12-3) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Therefore, any evidence may be excluded if the probative value is substantially outweighed by the prejudicial effect. In any

(continued . . .)

that Owen was a "possible absconder." The trial court struck the reference from the record once Owen objected and denied his motion for a mistrial.

[¶19.]     In order for an abuse of discretion to occur from the denial of a mistrial, the defendant must show actual prejudice. State v. Anderson, 2000 SD 45, ¶36, 608 NW2d 644, 655. Once Price inadvertently referred to Owen as a "possible absconder," the trial court struck it from the record and admonished the jury to disregard the statement. Trial courts have considerable discretion in determining the prejudicial effect of an excluded statement. *Id.* Here, the trial court determined that striking the statement from the record and admonishing the jury remedied the statement. Given the other evidence of Owen's guilt, he has not shown how he was prejudiced from this inadvertent comment when it was struck from the record and the jury was told to disregard it.

[¶20.]     **2.      Whether the trial court erred in denying the suppression of Owen's statements to law enforcement.**

[¶21.]     "Although there are often subsidiary factual questions deserving deference, the voluntariness of a confession is ultimately a legal question." *Holman*, 2006 SD 82, ¶13, 721 NW2d at 456 (quoting *Tuttle*, 2002 SD 94, ¶20, 650 NW2d at 30). "This Court reviews the entire record and makes an independent determination of voluntariness" by examining the totality of the circumstances. *Id.* In determining whether statements made to law enforcement are voluntary, we first look to the questioning officer's conduct. State v. Wright, 2004 SD 50, ¶7, 679

---

(. . . continued)
> evidentiary ruling the probative value can be considered and we do not require the trial court to conduct the balancing on the record.

NW2d 466, 468. Next, we look at the defendant's capacity to resist pressure created by the law enforcement officers. *Id.* ¶8. When analyzing the defendant's capacity to resist pressures, we look at a variety of factors such as:

> the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect.

*Holman*, 2006 SD 82, ¶15, 721 NW2d at 456-57. The trial court applied these factors after conducting an evidentiary hearing and denied the motion.

[¶22.]    Owen claims his confession was involuntary because he was being held in a jail cell on a murder charge and was questioned for three to four and one-half hours with only a few short breaks. Owen also claims law enforcement used the availability of tobacco in a coercive manner since he offered to tell the truth if given a cigarette, but he only did so after he requested a smoke earlier.

[¶23.]    First, the behavior of the officer questioning Owen does not indicate any overbearing or coercive behavior. The length of questioning was not particularly long. He was arrested late the night before, held overnight and questioned at 8 a.m. for three to four and one-half hours. Owen claims the police essentially bribed him to confess by offering tobacco. However, Owen offered to tell the truth if allowed to smoke. Price did not initiate the deal and cigarettes were not used as bribes or rewards for confessing.

[¶24.]     Next, Owen's age and experience with the law weigh in favor of finding voluntariness. He was thirty-two years old and had a fourteen-page rap sheet that revealed extensive experience with the criminal justice system. The court partially based its decision on Owen's numerous letters and pro se motions that demonstrated he was cognizant of his rights and able to exercise them. Owen was not subjected to any sleep, food or drink deprivation to induce confession. Owen claims he could not voluntarily confess because he was under the influence of alcohol and drugs, but the record reflects he slept well the night before, was alert and did not show any signs of impairment during questioning.

[¶25.]     Owen claims his confession was involuntary because he was questioned before he was *Mirandized*, and he did not waive his *Miranda* rights. However, the record reflects Price asked no incriminating questions before reading Owen his *Miranda* rights, but merely introduced himself as a state agent investigating the case and told Owen he wished to speak to him. Before Price began questioning Owen, he gave the *Miranda* warnings and the record reflects Owen waived his rights. Price testified that he *Mirandized* Owen two different times during the interview. Price stated Owen appeared to understand his rights and waived his rights both times.[3] Under the totality of the circumstances, there is no evidence on the record that Owen's confession was involuntary because he was not *Mirandized*.

---

3.     The audio recording of Owen's interview with Price indicates Price read Owen his rights and then stated, "Do you understand these rights and do you wish to waive these rights and talk to me at this time?" Owen alleges he only responded audibly to the second question and did not verbally indicate he "understood these rights." However, Price testified that Owen shook his head yes and verbally indicated he understood the rights.

[¶26.]      Owen's next argument is that the confession should be suppressed because law enforcement delayed bringing him in front of a magistrate. SDCL 23A-4-1 provides in relevant part, "A law enforcement officer shall, without unnecessary delay, take the arrested person before the nearest available committing magistrate." *See* State v. Hintz, 318 NW2d 915, 917 (SD 1982). The trial court found the morning interview of three to four and one-half hours was not an unnecessary delay.

[¶27.]      The Alaska Supreme Court considered a case similar to this case under its Alaska Criminal Rule 5(a).[4] In *Riney v. State*, the court found a two-hour delay for "reasonable post-arrest interrogation" does not constitute unnecessary delay. 935 P2d 828, 837 (Alaska 1997). *See* United States v. Daniels, 64 F3d 311, 313-14 (7thCir 1995); People v. Turner, 878 P2d 521, 541-42 (Cal 1994), *cert denied*, 514 US 1068, 115 SCt 1702, 131 LEd2d 564 (1995); Peterson v. State, 653 NE2d 1022, 1025 (IndCtApp 1995); State v. Chapman, 471 SE2d 354, 356 (NC 1996); State v. Littlejohn, 459 SE2d 629, 633-34 (NC 1995). The court went on to explain that the post-arrest interrogation was permissible only if the officers were not using it for "the purpose of gathering additional evidence to justify the arrest." 935 P2d at 834.

[¶28.]      In *Riney*, the defendant argued, as does Owen, that the Supreme Court decisions in *McNabb v. United States*, 318 US 332, 63 SCt 608, 87 LEd 819 (1943) and *Mallory v. United States*, 354 US 449, 77 SCt 1356, 1 LEd2d 1479 (1957), require suppression of the statements to law enforcement if there was an

---

4.    Alaska Criminal Rule 5(a), in relevant part, provides, "the arrested person shall be taken before the nearest available judge or magistrate without unnecessary delay."

unreasonable delay which induced an involuntary confession. *See Riney*, 935 P2d at 835-36. However, most courts have decided that unnecessary delay does not automatically require suppression of the defendant's confession. *Id.* at 836. Most jurisdictions conclude that unnecessary delay is only one factor to consider in determining whether the statements were voluntary. *See id.*[5]

[¶29.] Furthermore, once *Miranda* warnings have been given "it is generally difficult for defendants to show that their post-arrest statements were tainted by the lack of a prompt initial appearance." *Id.* at 837. As discussed above, Owen was given *Miranda* warnings and waived his rights twice. He was informed of his right to remain silent, yet chose to speak with Price. In addition, there is no evidence in the record that Owen could have been brought before a magistrate any earlier than his 1:30 p.m. hearing. Given the record, the defendant cannot show he was subject to an unnecessary delay or that he was prejudiced because his statements became involuntary by an unnecessary delay.

---

5. The opinion lists the following states that have agreed that unnecessary delay is only one factor to be considered in deciding whether the arrestee's statements were voluntary: Clay v. State, 883 SW2d 822, 827-29 (Ark 1994); Thorson v. State, 653 So2d 876, 887 (Miss 1994); State v. Tucker, 645 A2d 111, 117-19 (1994), *cert denied*, 513 US 1090, 115 SCt 751, 130 LEd2d 651 (1995); State v. Huddleston, 924 SW2d 666, 670-71 (Tenn 1996); Cantu v. State, 842 SW2d 667, 679 (TexCrimCtApp 1992), *cert denied*, 509 US 926, 113 SCt 3046, 125 LEd2d 731, *reh'g denied*, 509 US 941, 114 SCt 16, 125 LEd2d 768 (1993). *See also* Williams v. State, 825 A2d 1078, 1092 (Md 2003) (citing Romuldo P. Eclavea, Annotation, *Admissibility of Confession or Other Statement Made by Defendant as Affected by Delay in Arraignment--Modern State Cases*, 28 ALR4th 1121 (1984, updated July, 2006), § 6 ) (noting that the majority of state courts consider delay one factor in determining voluntariness).

[¶30.]    Owen's final argument in support of suppressing his confession is that his Sixth Amendment right to counsel was violated by questioning him after he had been formally charged.  However, once *Miranda* rights are given, the right to counsel is waived if the defendant does not request counsel.  Patterson v. Illinois, 487 US 258, 290-94, 108 SCt 2389, 2394-96, 101 LEd2d 261 (1988).  Failure to unambiguously request an attorney to be present during questioning means Owen waived his right to counsel.

[¶31.]    **3.    Whether the trial court erred by denying Owen's requested self-defense instruction.**

[¶32.]    Owen claims it was error for the trial court to deny his self-defense jury instruction.  We review the denial of a jury instruction for abuse of discretion.  State v. Motzko, 2006 SD 13, ¶19, 710 NW2d 433, 440.  Criminal defendants are entitled to an instruction on their theory of the case when evidence exists to support that theory.  State v. Bruder, 2004 SD 12, ¶8, 676 NW2d 112, 115.  However, if there is no evidence to support their theory of the case, then a trial court may deny the proposed instruction.  State v. Bogenreif, 465 NW2d 777, 781 (SD 1991).

[¶33.]    In this case, the record is devoid of any evidence which supports a self-defense jury instruction.  Owen claims that the fact Keeble stole his marijuana and then continued to "maintain[ ] a hostile attitude toward" him is evidence the property was taken by force and justifies the instruction.  However, theft of property is not justification for self-defense.  There is no evidence anyone threatened Owen or attacked him first.  In fact, the evidence shows Owen hid the knife from Keeble and stabbed him by surprise.  Under this record, Owen has not

demonstrated the trial court abused its discretion by denying his self-defense jury instruction.

[¶34.]    **4.    Whether there was sufficient evidence to prove first degree murder.**

[¶35.]    In reviewing an insufficiency of evidence claim, we review

> whether there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt; in making this determination, the Court will accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict.

State v. Mesa, 2004 SD 68, ¶9, 681 NW2d 84, 87. Owen claims there is no evidence to support the premeditation aspect of first degree murder.[6]

[¶36.]    Premeditation is defined as,

> an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in

---

6.    Homicide is murder in the first degree :

(1) If perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being, including an unborn child; or

(2) If committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing, or discharging of a destructive device or explosive.

Homicide is also murder in the first degree if committed by a person who perpetrated, or who attempted to perpetrate, any arson, rape, robbery, burglary, kidnapping or unlawful throwing, placing or discharging of a destructive device or explosive and who subsequently effects the death of any victim of such crime to prevent detection or prosecution of the crime.

SDCL 22-16-4.

> the mind of the perpetrator before committing the act resulting in the death of the person killed. *A premeditated design to effect the death sufficient to constitute murder may be formed instantly before committing the act.*"

SDCL 22-16-5 (emphasis added). When determining if premeditation exists we consider the following factors: 1) the use of a lethal weapon; 2) the manner and nature of the killing; 3) the defendant's actions before and after the murder; and 4) whether there was provocation. State v. Helmer, 1996 SD 31, ¶38, 545 NW2d 471, 477.

[¶37.]    In this case, Owen used a lethal weapon, a sharp fillet knife, to repeatedly stab his victim in the throat, head and face. He hid the knife to prevent anyone from seeing his intention and stabbed Keeble for allegedly stealing his marijuana. Owen urges us to find that there was provocation or even self-defense involved because Keeble continued to glare at him after Owen accused him of stealing his marijuana. However, this is neither provocation nor an act entitling Owen to use deadly force in self-defense. The statute provides that a murder designed to kill is still murder even if "the perpetrator was in a state of anger or voluntary intoxication at the time." SDCL 22-16-6.

[¶38.]    Finally, Owen stated he did not go to the home with the intent to kill. This is of little relevance. Under the statute, Owen can form the required premeditation the instant before the act. His statements that he was going to teach the group a lesson, he intended to "f*** one of them up" and the fact that he hid the knife from Keeble in an effort to attack him by surprise are more telling to his immediate state of mind. Viewing the evidence in the light most favorable to the

verdict, there is sufficient evidence to support the jury's guilty of first degree

murder verdict.

[¶39.]    **5.    Whether the State had jurisdiction over Owen's crimes.**

[¶40.]        The federal government or Indian tribe, not the State, has jurisdiction

over crimes committed in Indian Country.  Bruguier v. Class, 1999 SD 122, ¶14, 599

NW2d 364, 370 (citing Alaska v. Native Vill. of Venetie Tribal Gov't, 522 US 520,

527 n1, 118 SCt 948, 952 n1, 140 LEd2d 30 (1998)).  Indian Country is defined as

> (a) all land within the limits of any Indian reservation
> under the jurisdiction of the United States Government,
> notwithstanding the issuance of any patent, and,
> including rights-of-way running through the reservation,
> (b) all dependent Indian communities within the borders
> of the United States whether within the original or
> subsequently acquired territory thereof, and whether
> within or without the limits of a state, and (c) all Indian
> allotments, the Indian titles to which have not been
> extinguished, including rights-of-way running through
> the same.

18 USCA § 1151.  This case does not involve allotted land and the Lake Traverse

Indian Reservation, which once included the town of Peever, was terminated in

1891.  DeCoteau v. Dist. Court, 420 US 425, 445, 95 SCt 1082, 1093, 43 LEd2d 300,

314 (1975).  However, Owen claims the land where the crime was committed is a

dependent Indian community.

[¶41.]        In *Venetie*, the United States Supreme Court held that land owned in

fee simple by the Venetie Tribe was not a dependent Indian community.  522 US at

532, 118 SCt at 955, 140 LEd2d 30.  In that case, the Ninth Circuit applied a six-

factor balancing test similar to the one advocated by Owen.  522 US at 531 n7, 118

SCt at 955 n7, 140 LEd2d 30.  The Supreme Court rejected the use of a balancing

test[7] and instead held the lands must satisfy two requirements. *Id.* at 527, 118 SCt at 953, 140 LEd2d 30. "[F]irst, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Id.*

[¶42.]	The land upon which the Sisseton-Wahpeton Housing Authority (Authority) built the homes is owned by the City of Peever and leased to the Authority. The land cannot meet the federal set-aside requirement. The federal government did not set aside this land for use as Indian land.

[¶43.]	In addition, the land is not under federal superintendence. The Roberts County Sheriff's office provides police protection. Peever Volunteer Fire Department, which provides fire protection services, is not funded by the Sisseton-Wahpeton Tribe. There is no evidence on the record that the Housing development is under federal superintendence or a federal set-aside. This land is not a dependent Indian community within the meaning of 18 USC § 1151(b); therefore, the State has jurisdiction. *See* Nevada v. Hicks, 533 US 353, 362, 121 SCt 2304, 2312, 150 LEd2d 398 (2001) ("[s]tates have criminal jurisdiction over reservation Indians for crimes committed . . . off the reservation") (citing Mescalero Apache Tribe v. Jones, 411 US 145, 148-149, 93 SCt 1267, 1270-71, 36 LEd2d 114 (1973)).

[¶44.]	**6.	Whether there was a *Batson* violation in the State's exercise of its peremptory challenges.**

---

7.	The Court noted that the use of the balancing test "reduced the federal set-aside and superintendence requirements to mere considerations." *Venetie*, 522 US at 531 n7, 118 SCt at 955 n7, 140 LEd2d 30.

[¶45.]	When the State eliminates potential jurors on the basis of race, it violates the defendant's right to equal protection. Batson v. Kentucky, 476 US 79, 86, 106 SCt 1712, 1717, 90 LEd2d 69 (1986). In order to sustain a *Batson* challenge, a defendant must first establish a prima facie case of purposeful discrimination by showing he is a member of a cognizable racial group and the State used its peremptory challenges to remove members of the defendant's race from the potential jury candidates. *Id.* at 94-95, 106 SCt at 1722. If the prima facie case is established, an inference of purposeful discrimination arises. *Id.* The burden then shifts to the State to provide a race-neutral explanation for the use of its peremptory challenges. *Id.* at 97, 106 SCt at 1723.

[¶46.]	The State concedes that Owen established a prima facie case. The State offered explanations for its use of its peremptory challenges, which the trial court accepted. However, Owen argues the State's race-neutral explanations were merely pretextual rationalizations for eliminating Native Americans from the venire. We review the trial courts factual determinations for clear error. *Martin*, 2004 SD 82, ¶16, 683 NW2d at 405 (quoting State v. Farmer, 407 NW2d 821, 823 (SD 1987)).

[¶47.]	The State removed seven out of the potential eleven Native American jury members. The record reflects that the State had a race-neutral explanation for each peremptory strike used.[8] *See* United States v. Maxwell, 473 F3d 868, 873 (8th

---

8.	1. M.Q. – State's attorney had done mental illness commitments on her twice in the past.

(continued . . .)

#24011

Cir 2007).[9] The defendant has not demonstrated clear error and the record supports the trial court's ruling.

[¶48.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

_____

(. . . continued)

2. Q.K. – Owen told DCI agents that he was going to go see him. State's attorney did not feel it was appropriate to have a juror whose name may come up in the testimony.

3. B.R. – worked with the prosecutor for many years, but the end of the work relationship was "not amicable."

4. J.A. – related to Owen by marriage and a good friend of the victim's mother.

5. B.U.A. – State has prosecuted her and her husband for a combined total of five driving under the influence charges.

6. A.W. – two of her daughters were recently prosecuted by State on drug charges, a third daughter was in prison and she worked at the hospital where the victim was taken.

7. D.B. – failed to disclose information on his juror questionnaire. He applied for employment with the Sheriff's office and when denied employment threatened to sue on racial grounds.

9. The *Maxwell* decision was filed after oral arguments were heard in this case. In *Maxwell*, the District Court for the Eastern District of Missouri found there was no *Batson* violation where the prosecution executed its peremptory challenges to strike three of the five African-American males from the potential jury pool. 473 F3d at 869. The district court found the excuses were race-neutral, albeit "lame." *Id.* at 870. Noting "that the findings underlying a district court's *Batson* analysis depend largely on credibility evaluations," *Id.* at 871, the Eighth Circuit "defer[red] to the district court's discretion to permit the strikes to stand" and affirmed. *Id.* at 873 (Bright, J., concurring in result).

-18-